## Case No. 1,307.

### BENKARD v. SCHELL.

[5 Int. Rev. Rec. (1867,) 3.]

Circuit Court, S. D. New York.

Customs Duties—Action to Recover Excessive Duties—Evidence—Reference — Freight and Transportation Charges — Commissions—Fixing Costs and Charges—Protest—Appeal to Treasury Department—Duress — Compulsory Exaction — Responsibility of Collector for Act of Entry Clerk.

[1. In an action to recover excessive duties claimed to have been illegally exacted by a collector of customs, where the claim embraces items of account too numerous for the consideration of the court and jury, a reference will be made to an officer of the court to adjust the same.]

[Followed in Crookes v. Maxwell, Case No. 3,415.]

[2. Such illegal exaction cannot be proved by the testimony of a customs official that he had adjusted the amount of overpaid duties from papers on file, together with a statement of the same, where he produces but a part of the entries, and no proof of payment of the alleged excessive charges is made by plaintiff.]

[3. In such a case, proof by a customs official of the practice of the government in respect to appeals to the secretary of the treasury, and the refunding of duties, is admissible in evidence as bearing on the construction of the law.]

[4. A report made at the request of customs officials, without express instructions from the treasury department generally as to what charges were properly exacted, based upon information obtained from merchants and others, is inadmissible in evidence as not forming a proper standard by which to determine what charges were properly made in the case in hand.]

[5. Freight and transportation from the port of shipment is not a dutiable charge, under the customs act of March 3, 1851.]

[6. Commissions on importations from continental Europe cannot be charged for, in excess of 2 per cent., except that commissions on importations from Paris may be charged at the rate of 3 per cent.]

[See Munsell v. Maxwell, Case No. 9,932.]

[7. Costs and charges actually paid should be added to the invoice, and not arbitrarily fixed by the customs officials.]

[8. Act March 3, 1857, requiring a protest by the importer within 10 days of the time of entry of the goods, does not require a protest to be attached to each particular entry, but allows them to be prospective and continuous. Brune v. Marriott, Case No. 2,052, followed.]

[9. A failure to appeal from the decision of the collector as to the rate or amount of the duty does not bar a recovery against the collector for the refunding of the excess of duty exacted, as Act March 3, 1857, providing that the collector's decision shall be final and conclusive "as to the liability of the importation to duty or exemption," unless an appeal is taken, etc., refers to the liability of the importation to duty, and not to the rate or amount of duty imposed.]

[10. When charges are added to the entry by the importer, under protest, and by reason of a refusal of the entry clerk to receive such entry unless such additions are made, and for the purpose of obtaining possession of the imported goods, the additions so made are not voluntary, so as to preclude the importer from recovery of the excess exacted.]

[11. The exactions being compulsory, the collector cannot insist that the appraisement was conclusive.]

[12. The act of the entry clerk in compelling the addition to the entry was official, notwithstanding that the collector gave no instructions to him, other than to make entries according to law and the treasury regulations.]

Before SMALLEY, District Judge.

At law. This was an action brought [by Benkard and Benjamin H. Hutton] against the defendant [Augustus Schell] to recover back duties collected by him of the plaintiffs as collector of New York, alleged to be illegally exacted.

Mr. E. Delafield Smith appeared for the plaintiffs, and opening the case to the jury, stated that the plaintiffs imported goods from various places in Europe, and that on their being entered, the collector had added to the value of the goods on which the duties were· to be paid, certain commissions, and charges for inland transportation and for cases, &c., &c., which increased the value, and, of course, the duty, above what was the true value; that he supposed it would be admitted to be the law that the collector could not add any charge for inland transportation, and that the only commissions which could be added were the usual commissions; that what was the usual commission and charges had been ascertained by Mr. Phillips, one of the government officers connected with the custom house, and that for years duties had been refunded by the government in accordance with this report of Mr. Phillips, by virtue of consents given by the district attorneys of the United States, but that of late the government had required the importer to prove the fact before the court; that the objection would probably be taken for the defence that no appeals had been made to the secretary of the treasury, but as to this he should show that when appeals had not been taken, it'was in consequence of letters from the secretary of the treasury to the effect that they were not necessary, and that another point of defense might be taken on the terms of the protest some of which were intended to apply to all future importations of a similar character, but he supposed it was pretty well settled that such protests were sufficient. Charles G. Clark was sworn and testified that he had been employed in the auditor's department since January, 1864, and had charge of protests and refunding; that he had adjusted the amount of overpaid duties in this case, and he produced the statement made up by him; that he had brought up only a part of the entries relating to this case, which would be about 500 in number.

District Attorney Courtney, who appeared for the defendant, said he did not propose to try the case by specimens; that the plaintiffs must prove their payments, for he should not admit that payments had been made. This, he understood, had been the great wrong perpetrated heretofore on the government.

Mr. Smith said that all parties had agreed that the entries were so numerous that the court would not investigate them, and that

as he understood, Mr. Clark had made up this statement by consent of Mr. Allen, the assistant district attorney, who had also examined it, he thought that under that understanding Mr. Clark's evidence should be taken.

The district attorney said that they might as well understand at once the position that he took, and the instructions which he had received from the government; that the court was aware, from report' at least, that great fault had been found at the treasury department in regard to the manner of adjustment of amounts, and to the payment or refund which had been made to parties claiming the return of duties, illegally exacted, in this class of cases; that fraud had been openly charged in regard to the action and conduct of certain clerks in these matters, and the government had found it necessary to regulate them by enforcing some strict rules in regard to their trial; that he knew nothing about the payment of duties by plaintiffs in this case, though he had no doubt that what Mr. Hutton would say about it would be substantially correct, but he was there to protect the interests of the government, and had besides received very explicit instructions from the treasury department, which he would read. The letter was then read as follows:

· "Treasury Department.

"Solicitor's Office, Oct. 24, 1866.

"Sir: Herewith I transmit a copy of a letter which I have just received from the secretary of the treasury, in relation to the conduct of suits instituted against the collector of customs at New York for the return of duties alleged to have been illegally exacted, and you are requested to conform your action to the views therein expressed.

"Very respectfully,       Edward Jordan,
              "Solicitor of the Treasury.

"Saml. G. Courtney, U. S. Attorney, New York."

"Treasury Department, Oct. 23, 1866.

"Sir: I have considered your letter of the 14th of August relative to instructions which should be given in the matter of certain suits instituted against the collector of customs at New York for the return of duties alleged to have been illegally exacted.

"I am of opinion that the instructions which have heretofore been given to the district attorney to plead the act of limitation to all claims instituted against the collector should be reiterated.

"Where prospective protests are relied on, it is my opinion that their legality should be resisted, and the matter left to the decision of the court.

"The district attorney should be instructed to bring to the notice of the court the informality which it is represented has for some time existed, of having the statement

upon which the judgments are rendered, made up in the custom house. I fully concur with you in the opinion expressed, 'that no verdict should be permitted except for a sum certain after a settlement in an appropriate way of all questions both of law and fact, and that it should be either by a jury or by some officer of the court, its clerk, one of its commissioners, or some other like officer who will be amenable to its order, and whose report should be subject to exception by either party as to matter both of law and fact.'

"The district attorney should be instructed to reserve by bill of exception all points of law decided by the court adversely to the United States.

"I am, very respectfully, H. McCulloch, "Secretary of the Treasury. "Hon. Edward Jordan, Solicitor of the Treasury."

After this letter had been read, Mr. Courtney continued: The court is aware that for the last eighteen months none of those so-called collectors' cases have been tried—this court refusing to make any order of reference or to take any steps backward or forward in them. I have therefore, under the circumstances, been obliged to bring this class of cases for actual trial before the court so that the legal principles involved may be decided, and such course as to adjustment of amounts, in accordance with the principles settled, may be adopted as may be satisfactory, to the government and the parties.

SMALLEY, District Judge, said: This is a class of cases with which I am very familiar, and the history of them is this: The very same difficulties which the court found in trying those cases years gone by, seem to present themselves here. Here is an illustration. Here are some five hundred entries. Now the court and jury cannot undertake to examine these five hundred entries, and yet not to examine them in some way would be a denial of justice. Now I will state my judicial knowledge of the history of these cases. When I first had the honor to come to preside in this court there were a great many of this class of cases on the calendar. The practice that prevailed at the time in trying them as stated by the district attorney at the time, Judge Roosevelt, and the clerk of the court, and I think by Judge Nelson on some occasion, was to hear the case fully, that all the questions of law that might be raised on either side should be passed upon, the whole case considered, then a verdict rendered, and as far as the assessment of damages was concerned it was referred to the custom house authorities. That was the practice in this court when first I had the honor to preside here—that was the rule in fact. It struck me as being very loose practice. In the custom house there was no one responsible. What officer should make it up? What clerks should be instructed with the duty of investigating the necessary papers, or who should be held responsible for the report? This, to my mind, was very vague and indefinite. I suggested that difficulty to the district attorney and to the different counsel, and stated to them that I was willing, with the consent of all the parties, to refer the investigation of the records of the custom house to the collector by name, although, indeed, he was defendant, or to the auditor by name, and that he should be responsible; that some person should be responsible to the court for the correctness of the report. That rule was adopted that term, and very many cases, by the consent of the district attorney and counsel were referred in that way. After a time, however,—I don't recollect how long, perhaps twelve months, perhaps longer,—complaint was made of unreasonable delay in the custom house on the part of the officers to whom these cases were referred, in adjusting these claims; complaint was made here by counsel in open court. I then took occasion to state in presence of the district attorney, that if those complaints were well founded, the cause must not be permitted to exist, and that if I found that they were well founded, I would revoke every order made to the custom house, and refer them to an officer of the court who would see that the reports were properly executed and presented to the court for action within reasonable time. Some little time after this Mr. Griswold came into court with affidavits in reference to some cases in which he had been counsel for the plaintiffs, and in which verdicts had been rendered, setting forth that the papers were delayed a long time in the custom house, notwithstanding the various applications had been made for them, and that he could get no adjustments made. I thereupon revoked the rule of reference and had them referred to in the clerk of the court, stating that I would revoke every case that was on the calendar whenever complaint was made to me officially that those delays were made, after suitable instruction, and that no reports were made. Some two or three weeks afterward Mr. Griswold again came into court with affidavits in some thirty or forty cases of the same character, in which verdicts had been taken and reference made, and I revoked them all and referred them to the clerk of the court. This was in 1862. From that time I had little to do with trials or this class of cases till 1864 and 1865. I was occasionally here, but other business engaged me. I, however, learned from a public report that some committee of congress, or some one acting for a committee, was here, and had made animadversions on this mode of practice—the practice of referring those custom house cases to the adjustment of the clerk of the court. I looked at the report and found a very scandalous statement, one perhaps technically true, but really false; and it was evident to me that

whoever was the author of that statement had forgotten the rule of morals as well as of law—that the suppression of a truth is the suggestion of a falsehood. In this case it was a very foul suppression of truth. The report stated that Judge Nelson had made the change of reference from the custom house to the clerk of this court for the benefit of the clerk who was his son-in-law, Mr. White, omitting to state the fact that the precedent had been made by a judge who had no connection with Mr. White, and that Judge Nelson only allowed the practice established by his junior for reasons satisfactory to himself. Judge Nelson naturally felt as a pure judge and an honorable man would, assailed for his action in court in an official report emanating from the legislative branch of the government, and he revoked the rule and practice established by me, and said he would make no further references. I had no further conversation with Judge Nelson on the subject, but I could well understand what influenced him to revoke these rules of reference. I am disposed to follow the same rule I made then. My own opinion is not changed since I revoked the former rule of reference in those cases, and, so long as I have the honor to sit upon this bench, I shall carry out the dictates of my own judgment, as to the proper manner of trying these cases. I do not believe Judge Nelson revoked my rule on the matter because he thought the reference was improper, but because this committee had presumed to assail in his judicial character one of the most able, upright and conscientious judges that ever presided in a court of justice, simply because he followed a precedent set by a junior who had perhaps given the question more thought than he had, by a statement which suppressed that fact, and by its suppression left a false and foul imputation and was false and calumnious in the highest degree. I am now disposed to go back to my former rule, and let some of these cases be entered upon and all the questions raised, and have reference of the cases made to some officer of the court to make the adjustments. We cannot sit all the time trying these cases. We see the absurdity of such an attempt for a court and jury to take up the five hundred accounts here; there are not days enough in the year to afford us time for it. You may take up two or three cases or more if you choose, and investigate them, and have every question raised passed upon by the court and jury, and take a general verdict, as we did before this base and calumnious report I referred to was made and refer the matter to an officer of the court. I shall be disposed to consult with the district attorney and counsel for the plaintiff in regard to the proper officer of this court, but it must be an officer of the court, responsible to the court and removable at pleasure.

Mr. Courtney—That, your honor, is in substance what my instructions from the department call for.

THE COURT—I have taken occasion to give a history of the practice in these cases because the report of this committee on custom house, as shown to me, I repeat it, was false and calumnious. Technically it may be true that some cases were referred, but the important truth was suppressed, that the judge was merely following the precedent set by me, and I repeat emphatically that in this case the suppression of the truth was a suggestion of falsehood.

Mr. Smith then proposed to prove by Mr. Clark that he made up a report of the facts of these copies.

THE COURT said that was not evidence unless it was agreed to by the district attorney, and that under the instructions which had been given, he was not authorized to agree to it; the best way, therefore, was to try the three entries produced if they covered all the questions involved.

The district attorney said it was very simple to present some of the entries to the court and have the ruling of the court, whether the additions were properly made and then the proper officer could make the adjustment for the rest as the court had suggested.

The judge said that would be the rule, and the district attorney should have opportunity to appear on the adjustment. It was impossible for the court and jury to sit and try all the various entries, which embodied 2,000 papers.

It appeared, on further examination, that the entries produced were barred by the statute of limitations, and the court took a recess to enable others to be produced from the custom house. Several entries were then produced, and Mr. Clark testified that the excess of duty on the overvaluation of the first was $12.94 on charges; that the charges were those which were put on the entry by the appraisers, over and above the proper amount as stated in Mr. Phillips' report, and that this sum was paid with the duties before the goods were delivered to the plaintiffs. Several other entries were also put in, dated in 1857 and 1858, and the witness states that the overcharge of duty on them was on one $4.32 and another $11.10, and on a third $2.28, and a fourth $11.28, the third being on commissions and the others on charges. All the entries had protests attached except the third. On cross-examination the witness said he went into the custom house in June, 1864; that this suit was commenced in 1862; that he knew nothing of the protests except that he found them on file with the papers; that he could not tell from the entries what the charges that were added were for, and only told the amount of overcharge by taking the amount allowed for charges in Mr. Phillips' report and deducting that from the charges which appeared in the entry, but that the entry did not show what the charges were

for, and he did not know and had no personal knowledge of the payment of the duties or the delivery of the goods.

Samuel G. Ogden was then called and testified that he was auditor of the custom house, and had been since 1842. Mr. Smith offered to prove by him what had been the practice of the government in respect to appeals to the secretary of the treasury and refunding duties. The district attorney objected on the ground that such a practice could not control the law.

THE COURT allowed the evidence as bearing upon the construction of the law.

The witness said that the act of 1857 had been considered to have no reference to cases like this, but only to cases where the rate of duty was involved, and that letters from the secretary had taken that view. He produced several letters, the last of which is as follows, the others having reference not to this, but to analogous cases.

"Treasury Department, June 9, 1862.

"Sir: I am in receipt of your report of the 24th ult., on the appeal taken by Messrs. Benkard & Hutton on the assessment of duty by you on certain charges added by the appraisers to their invoices per Hansa, in February, Bremen and Hansa in March last, the applicants contending that the said charges are included in the invoice price of the goods. As it appears from the report of the appraisers that the charges added by them to the invoice were the usual costs and charges to be added to the actual 'market value or wholesale price' to fix the dutiable value, I perceive no reason to interfere with your decision in the case. I would here state for your information that this class of cases is not deemed as coming under the provisions of the fifth section of the act of March 3, 1857, [11 Stat. 195, c. 98,] that section having special reference to the liability of goods, wares or merchandise to duty or exemption therefrom, and not from charges.

"I am, very respectfully,
　(Signed)　　　　　　　"S. P. Chase,
　　　　"Secretary of the Treasury.
"Hiram Barney, Esq.,
　"Collector, &c., New York."

He further testified that Mr. Phillips' report had its origin in instructions from the treasury department in February, 1856. In adjusting statements made for return of duties on charges, upon instructions then recently issued from the department, there was a difficulty in ascertaining the amount of charges on which duties should be paid. For this purpose application was made to the appraisers, as being parties most familiar with the subject, to report what charges should be considered as dutiable. In pursuance of that request Mr. Phillips made this report of what charges he considered dutiable. This report was afterwards adopted by the court in a case which came up, which held

that the duty should be retained on the amount which he reported as dutiable, and the excess should be refunded. Since the report both the court and the custom house authorities have adopted it and acted upon it.

On cross-examination, he said: We requested Mr. Phillips to make the report, but had no special instructions from the treasury department to have him make it.

Mr. Phillips was also called and gave a similar account of his report, which he said he made from such information as he could get here from merchants and others.

Mr. Ogden recalled, stated that he had recently received drafts from the treasury department for the refund of duties in similar cases, the amount of which had been ascertained in conformity with Mr. Phillips' report; the last had come that very morning, but the judgments were rendered perhaps a year ago.

Mr. Hutton, one of the plaintiffs, proved that the plaintiffs had been in the habit of appealing to the secretary in similar cases, until they were stopped by a letter from the secretary of the treasury, which he produced, and that the protests attached to the entries were made by his direction generally when the entry was made, and always within time, and that he himself made the protest in all cases where he swore to the entries, and always presented the protests with the entries.

THE COURT here ruled that Mr. Phillips' report could not be received as evidence in the case, or as forming any proper standard by which to determine what charges were properly added.

The case was then adjourned to enable the plaintiffs to conform their testimony to this ruling.

When the court reassembled Mr. Hutton was recalled, and producing several more entries, testified that there were on them certain additions for charges and commission, where no charges or commission at all had been paid by his firm, and that the usage was in many of the principal markets in Europe, which he named, to render their invoices of goods "free on board" at the port of shipment; that the charges were added here on compulsion because the custom house authorities refused to receive the entries unless they were added, and they accordingly specified them on the entry as added "by compulsion." On cross-examination he said that he could not say, that he himself made the additions, or that the requirement was made in every case, because the rule having been settled in one case, they would conform to it in subsequent cases.

Henry D. Moore, the plaintiff's custom house clerk, was called, and testified that he made the entries at the custom house, and that the additions of commissions and charges on the face of the entries were made by him; that they were added because they were compelled

to add them; that he had presented entries where they had not been added, and the entry clerk refused to pass them, and before they could be passed he had been compelled to add them. On cross-examination he said he did not see the collector himself about the matter; made up the entries just as they were before he went to the custom house, but considered that there was compulsion in the case because he knew the entries would not be passed unless the additions were made, from the fact that they had been refused before.

Mr. Schell, the defendant, was called as a witness, and testified that he was collector from July 1, 1857, till April 8, 1861; that he recollected having considered the subject of requiring importers to make additions to their entries, and his conclusion was that it was not his duty to instruct or to control the merchant in making his entry. The law prescribed the mode in which the entry should be made, and the importer made it on his own responsibility entirely; the collector had nothing to do with the form of the entry, except to see that it complied with the regulations; I never gave any instructions with reference to the plaintiff's case; I never gave any instructions to the entry clerks for the addition of commissions; I never directed any person to compel the importers to add to their entries, or instructed any one to request or compel the plaintiffs to add to their entries. Cross-Examined—The deputy collector who had charge of the entry department is dead, I believe; the matter would not have been deputed to him; it would have been an assumption on his part to exercise that power which no merchant would submit to and the department would not permit; charges are usually assessed on the invoices by the appraisers, if the importer does not choose to do it himself; I can give no information as to what took place on the entries in this case; I never saw them till this morning. Redirect—I considered this question after I took the office; I gave instructions to receive the entries under the law; the advances that were made on invoices came to my knowledge; I had no instructions to give about it; the officers had to discharge their duties; whatever advances the appraisers made were made on their own responsibility; they assessed the duties according to the law and the regulations of the department; I can't tell about these goods; the practice in the office was that the merchant delivered his invoice and bill of lading; then he made the entry showing the charges, which he presented to the deputy collector or the entry clerk; the entry was sworn to, and the duty was then assessed by the entry clerk, and the merchant deposited the duty or gave bond; the invoice was then sent to the appraisers' office, and a permit was given to the merchant before he could receive his goods; if the invoice was returned "correct," the entry was liquidated. The duty was as-

sessed by the entry clerk under the law, on the value as set forth in the invoice. If the appraiser afterwards makes it more, the merchant is called on to pay more than he deposited. If the deposit is in excess of the duties the excess is refunded. The appraiser's return controls the assessment of the duties, but if the merchant is dissatisfied he has the right to appeal. The entry would have been passed though it did not contain the costs, charges and commissions. I recollect three or four cases where it was done. That was the general practice.

The testimony was here closed.

Requests to charge were made by both parties, which we have not room for.

SMALLEY, District Judge, (charging the jury.) Before leaving to the jury the questions of fact, the court proceeded to dispose of the questions of law involved. After stating for what the action was brought, and referring to the importations, entries and protests of the plaintiffs, he said: The plaintiffs claim that their evidence tends to prove: 1. That in some cases they paid no freight or charges of any kind; that the goods were "free on board." 2. That in other cases they have been compelled to add an arbitrary sum for costs and charges more than the amount paid by them. 3. That they were compelled to pay an extra charge for commissions above the usual rate in the market in which the goods were purchased. 4. That they duly protested against these exactions, and only submitted to them for the purpose of obtaining possession of their goods. The defendant resists the recovery because he says that inland freight was properly added to the invoice, under the act of March 3, 1851, and that the other costs and charges were proper and legal under the treasury instructions and the law. This raises a question which has been a good deal discussed, and about which there has undoubtedly been some diversity of opinion in the courts. On Feb. 1, 1856, the then secretary of the treasury, Mr. Guthrie, himself an able lawyer, issued treasury regulations in a pamphlet form, in which he says: "Freight and transportation from the port of shipment to the port of importation is not a dutiable charge." This construction was thus early given to the act by the treasury department. If that is a correct construction of the law, such charges are in violation of the law, and cannot be sustained. The question seems to have come before the circuit court in a case in California in 1858,—Gibbs v. Washington, [Case No. 5,380,] in which the court came to the same view as the secretary of the treasury did in issuing the regulation which I have read. Again, a treasury circular was issued, dated May 1, 1863, while the present chief justice of the United States was secretary of the treasury, reaffirming the principle laid down in the treasury regulation of 1856, and conforming to the decision of the circuit court of Cali-

fornia in the case of Gibbs v. Washington, [supra.] This decision, certainly of a very respectable court, does not seem to have been overruled, and has only once been questioned, in the case of Warren v. Peasley, [Case No. 17,198,] in an opinion by Judge Curtis. I think, therefore, on looking at the law itself, and the treasury circulars of the different administrations, that the charges added for inland freight were illegal. I do not mean by that that they were understood to be illegal at the time they were made. I mean that it was an erroneous construction of the law, and nothing more.

Then as to commissions—in all these protests which have been brought to the notice of the court, it seems that they were charged 2½ to 3 per cent. commissions. The statute requires the charge of the "usual rate" of commission. This has received a judicial construction. If it had not, it would seem to be very difficult for lawyers to differ upon the subject. There really seems to be room for but one opinion. It is not what the importer may have paid as commissions. He may have got the goods without paying any commissions, but he would still be liable for a charge for commissions. and must pay the duty upon them. On the other hand he may have paid much more than the usual rate of commissions. But he is not bound to pay on more than the usual rate, because that is the sum fixed by law, and what is the usual rate is a question of fact. A number of witnesses have been examined upon that subject. The plaintiff himself, Mr. Hutton, an old, experienced and very intelligent merchant, and two or three custom house officers, Mr. Phillips and Mr. Ogden, I think, testified upon that point. The evidence is uniform. There is no discrepancy that the usual rates of commission in continental Europe are two per cent., except Paris, where they are three per cent., and that for Great Britain, they are one and a half per cent. All the importations that I have examined in this case came from continental Europe, and consequently upon this evidence, only two per cent. commissions should have been charged, that being the usual rate. If there were any from Paris the commissions should have been three per cent. If, therefore, the commissions upon any of the entries from continental Europe, except Paris, were increased above two per cent. any commissions demanded above that rate were illegally exacted, and if they are proved upon the part of the plaintiff in this case, they should be refunded; and if from Great Britain, where the usual rate is one and a half per cent., if any greater commissions were exacted, they were illegal and should be refunded.

The costs and exchanges should unquestionably be added to the invoice—that is, what was actually paid. They have no right at the custom house, any more than the merchant has the right to make an arbitrary estimate for purposes of convenience. It seems that for many years they have adopted what has oftentimes been called in the court (and I have had it in previous trials before me) Phillips' Report, for the convenience of the parties, the custom house and the merchant, which may be in the main. and probably is, nearly correct. But that is used only by consent. The custom house has no more right than the merchant to fix an arbitrary value upon these costs and charges. The merchant is bound to enter the actual costs and charges as they were paid. If there were more paid; if the goods were delivered "free on board," free from all those charges, then it has rightly been held in this court that the importer was not liable for any, for the reason that it is to be supposed that those charges were paid by the seller and made up a part of the marketable value of the goods. There are many cases as well by Judge Nelson as the other judges sustaining this point.

The second objection of the defendant is that there were no protests sufficient to enable the plaintiffs to recover in these cases. The act of February, 1845, required the protest to be made "at or before" the entry. The act of March 3, 1857, under which these entries were made, changes the expression "protest," but uses language very similar, and says it must be done within ten days of the time of the entry of the goods. The language of this act as to what the protest shall contain, is precisely like that of the act of February, 1845, probably being copied from it, and provides that the protest shall set forth distinctly and specially the objection to the payment of the duties so that the collector may know the reason of the protest. We have already seen what these protests are. They seem to set forth as clearly and distinctly as the English language will well admit, the objections which the merchant makes to paying these duties. I cannot well conceive making them more clear.

But it is objected that in some of these cases there have been no protests filed at the time, or even within ten days. It is conceded, however, that there had been previous protests filed, which claimed to be prospective and continuous, and which the merchants intended to be so. The question of prospective protest has undergone a good deal of discussion in the courts, but it seems to be now well settled so far, at least, as this circuit is concerned, and I think, unless the decisions are overruled by the supreme court of the United States, the law of the land is settled. The first time that the question arose whether a protest of this kind was valid as to subsequent importations, was in Maryland, before Chief Justice Taney in the case of Bruce v. Mariotti, [Brune v. Marriott, Case No. 2,052,] which appears to have been tried in April, 1849. The question was discussed before the chief justice by a very able lawyer, then, I think, holding an official relation to the government, Reverdy Johnson,

who maintained that the protests were invalid and insufficient, but the chief justice decided that they are clearly sufficient, and says that there is nothing in the letter, the reason or the spirit of the law, which requires one of these to be attached to every particular entry that is made. That case went up to the supreme court and was decided there in January, 1850. [Marriott v. Brune,] 9 How. [50 U. S.] 620. The question was again pressed upon the supreme court by Mr. Reverdy Johnson, with his usual ability, as the report of the case will show. Justice Woodbury delivered the opinion of the court, sustaining the opinion of the chief justice. So far as appears from the report, this was the unanimous opinion of the supreme court. It came up again before this court in November, 1855, Judges Nelson and Betts sitting together, in the case of Steadman v. Maxwell, 3 Blake, 369. [Steegman v. Maxwell, Case No. 13,344.] They held the same view, and that has been followed in this circuit in very many instances, among which is the recent case of Fowler v. Redfield, [Case No. 5,003,] not reported, decided by Judge Nelson in December, 1862. I am at a loss to conceive how a distinction can be made between this class of prospective protests and the protest that was presented in the case of Bruce v. Mariotti, for clearly this is a guide as distinct and specific, and, I think, a little more so than the protest in that case.

Another suggestion may be made. All these protests were made under the act of February, 1845, the language of which is adopted in the act of 1857. Now it is hardly to be supposed that the eminent lawyers to be found in both branches of congress, when they adopted the language of the act of 1845 in the act of 1857, did not know what construction the courts had given it. It cannot be that the supreme court decided this question in 1850, and that this legislation took place six years afterward, in ignorance of it. If it had been the design or the desire of congress to change the construction which the government and the court had given it, it is very natural to suppose that they would have used different language in the act of 1857, in order to indicate their design in some manner. There is but one case that I have ever seen in which the decision in Bruce v. Mariotti [supra] has been criticized, and that was the case of Warren v. Peasley, [supra,] where Judge Curtis, in the Massachusetts circuit court, ruled that the protest was insufficient, and very ingeniously (for he was a learned and able judge, possessed of a very acute and logical mind,) attempted to make a distinction between the two cases. But I must confess, from the examination I have given it, it seems to me to be a distinction without a difference. The principle in each appears to be precisely the same. Again, if there were no judicial decisions upon this subject, we reach the same result in reasoning. What was the object of the

legislation providing for this protest? It was that the collector should be advised distinctly and specifically what the merchant insisted he ought not to pay, and which he protested against as an illegal exaction, and that he intended to hold the collector responsible under the law for the exaction. Why is it necessary to repeat it? This case furnishes a very fair illustration of it. Here is a merchant making some 500 entries in this port, at least one almost every week in the year, and perhaps more, of precisely the same character. What sound reason is there for compelling him to go through the formula of saying in each one of these cases "I protest," when he has told the collector in the first case that he protests against that and against all similar exactions. I am at a loss myself to see any good purpose that would be answered by the court's adopting that construction.

The third objection made to the recovery in this case is that no appeal was taken to the secretary of treasury under the fifth section of the act of 1857. In giving a construction to that act it is perhaps well and wise to consider the purpose of the act. That it is a severe act, one that was intended to and does limit and restrict the common law and equitable rights of the merchant, all must agree. It is a well-settled rule of construction in all courts, that acts of this description shall be construed strictly; that they shall not be extended any further than the language of the law requires. But they must be enforced as far as the language does require.

The language of this act, so far as this question is concerned, saying that the decision of the collector shall be final and conclusive unless it is appealed from under certain conditions afterward described, says that the decision of the collector shall be final and conclusive "as to their liability to duty or exemption therefrom." What is meant by liability to duty or exemption therefrom? We have had the difference between the rate of duty and the liability to duty very clearly explained by Mr. Ogden. Now it is very clear that "liability to duty or exemption therefrom" does not in itself, by any fair implication of language, extend to the rate of duty that may be imposed, or to the amount of duty, but simply to the question is it dutiable? I have had put into my hands the opinion of a very able lawyer, formerly upon the bench, now at the bar again, who considered the act to apply not only to exemption from duty entirely, but to the rate of duty. I am inclined to think that his reasoning upon that subject, though not necessary here, is probably sound. The question here is not whether this language of the act necessarily implies that the decision of the collector shall be final, when he decides whether a certain article is liable to duty, or if liable, at what rate of duty, 5, 10 or 15 per cent. It is not the question

here whether this property was liable to duty. It is conceded that it was. It is not the question what the rate of duty should be—whether any of this property should pay one per cent., or another. It is admitted to be liable to duty, and the rate is conceded. The merchant and collector agree upon that.

The collector claims, however, that certain charges should be added. That the merchant denies. Now does it necessarily follow from the reading of the language, that the decisions of the collector shall be final upon that question, construed as I have already stated it should be? Such would be my construction, without authority; but I am happy to find that I have been anticipated in this by the decision of the treasury department itself, having charge of these questions. It seems to be the decision of Secretary Cobb, Dec. 20, 1859, and, again, April 7, 1860, upon this precise question, in instructions to custom house officers throughout the country, that in such cases the rule requiring appeal did not apply, and that it was unnecessary to take it. Secretary Chase, on June 9, 1862, took the same view of it, in a very full and masterly letter, that no appeal was required. This was in relation to this particular class of cases—costs and charges. It also appears from various pieces of evidence that these instructions of Secretary Cobb and Secretary Chase have been acted upon by the treasury department. In a great variety of instances hundreds, and perhaps thousands, hundreds of thousands of dollars have been refunded, which would not have been refunded if this act of March 3, 1857, [11 Stat. 195, c. 98,] had been understood as applying to this class of cases. It appears that on March 30, 1865, Mr. Secretary McCulloch repudiated this construction. But even in that case—I do not remember the name of it—it appears that he reconsidered it and ordered it to be paid judgments rendered on that ground, so that that can hardly be considered as a revocation of the previous action of the department, although in this case his instructions to the district attorney are unquestionably such as to require him to raise that question and a great many others. I hold, therefore, that upon that ground an objection cannot be sustained; that there is no bar to recovery in this class of cases, in this section of the act of 1857.

Again, it is claimed, that the additions to these entries were the acts of the plaintiffs, and in consequence, that the payment of the duties thereon are voluntary, and therefore that the plaintiffs should not recover. That is to a certain extent a question of fact which will be submitted to the jury. If, however, the evidence of the plaintiff and of his custom house clerk is true, if the jury give it credence, taking it in connection with some further testimony which has been offered this morning—if the jury give credence to their statement that when they made those entries they were told by the entry clerk of the custom house that they must make these additions or he would not receive the entry, and that they acted under these instructions for the purpose of obtaining possession of their goods, making a protest at the time and saying that it was added by compulsion, then that was not the voluntary act of the merchant. In one sense it might be called perhaps the act of the collector; but we cannot call that the act of the merchant, which was done under what may be called legal duress, so far as the word "duress" can properly be applied to property instead of to persons, which is not a strictly proper application of the term, although other courts have used it before. This is a question of fact which will be submitted to the jury, and if they find these facts they will be told that this objection also is of no avail.

Another objection to recovery in this case is that the action of the appraiser was conclusive, and that the collector was by law bound to collect the duty on the amount returned by them. Without going into any elaborate discussion of the principles which might be involved in that proposition, it is sufficient to say that in this case, if this act of the plaintiffs was based upon a compulsory act of the collector, if the plaintiffs put the entries on these to obtain possession of the goods and protested at the time, saying they were illegal; but if he put the additions on because they would not otherwise pass the entry, if that was the foundation of it, this, too, falls to the ground. The original wrong was in the collector or his agent, and he cannot now turn round and say, "I forced you to put it on, else I would not let you have your goods." The English of it would be this: "But when it was put on it went into the hands of the appraisers, and the appraisers accepted it and made no change, and when it came back I was bound to exact the duty, and now I will not pay it back to you because you put it on there." How came he to put it on there? It comes back to that question.

In this position is the objection which has been practically offered here this morning, by the evidence, that the collector is not liable for the action of his entry clerk. The statement of Mr. Schell as to what he thought would be done is a matter of no consequence here. Mr. Schell stated that he gave no instructions to the entry clerk, other than to enter the goods according to law and the treasury regulations, and he does not think they used any compulsion in this case: but that is not evidence. No one doubts that the statement of Mr. Schell is strictly true, that his instructions to all his clerks were to perform their duties according to law or the treasury regulations emanating from his superior, the treasury department. It is now claimed in his behalf by the counsel for the government, that the entry clerk

did that without his authority, and that therefore, although it was an official act, he was not bound by it. Probably there have been thousands of these cases tried in this and other places within the last twenty years. I presume this is the first time this objection was ever made, and I cannot regard it with favor now. It must be overruled. Let us look for a moment. Suppose this principle was admitted to be sound, what would be the position of the merchant? He goes to the proper officer. The immense business of the custom house must be divided among various branches, each having a separate and distinct head, and having clerks under them. This is a necessity. The custom house here is a large part of the treasury department—a sub-treasury department of itself. The merchant goes to the entry clerk and is told, "I cannot take your entry here, unless you make certain additions to it." "But" he replies, "I do not consider these right; I will not make them; I did not pay these charges; it is a violation of the law to require me to make them." "Well, I shall not take your entry unless you do." There stands his cargo of goods, liable to injury or destruction; he cannot litigate the question then, and he says "I will put it on, but at the same time I will tell you why I put it on that it is because you compel me to do it," and he protests at the very moment. He writes upon the entries by "compulsion," and leaves with the entries a protest that he makes the addition because he is compelled to do it in order to get possession of his goods, that it is illegal, and that he intends to get it back if the law will sustain him. That is the English of it, without going through it further. This would leave the merchant at the mercy of every little entry clerk, if the clerk—here to-day and there to-morrow—alone was responsible. The gross injustice which is manifest in the practical operation of this principle, is sufficient to show that it cannot be founded in law. The law has sometimes been said to be the perfection of human reason. There is reason in law—it is the spirit of it. But I do not think there is any reason by which such a principle could be maintained. It is true that Mr. Schell gave his officers most explicit instructions to act according to law, but it is equally true that he says he knew they were making these exactions. He supposed, probably, that it was according to law. No doubt he did, or he would not have done it. And if he knew it and the money went into his hand, on another principle he would be liable. I refer to the old rule, qui facit per alium facit per se, which applies here most emphatically. So that I think this objection is without any foundation. It would hardly do, when money has been illegally exacted by an officer under Mr. Schell's control and paid by him into the treasury, (and whatever the rule was before, Mr. Schell is personally protected now,) it would hardly do to turn round and tell the importers that they must look up the entry clerk, who when found might be responsible. This disposes of the questions which seem to me to be questions of law. Various requests to charge have been made, which I shall not take particular notice of, but the defendant will have the benefit of them so far as I have declined to comply with his requests. There remain only two or three questions for the jury which I will now submit to them. 1. Was the amount of costs and charges paid by the defendants on these entries equal to the amount on which duties were paid? 2. Were the commissions stated in the entries at the usual rate? 3. Were the additions on these entries made by the plaintiffs voluntarily, or to obtain possession of the goods?

The jury found a verdict for the plaintiffs.

[NOTE. A reference was ordered to adjust the amount of recovery, and judgment was thereafter entered for plaintiffs. Pending writ of error to the supreme court, the parties agreed to set aside the proceedings, that a new trial should be had. For such new trial, see Hutton v. Schell, Case No. 6,961.]

---

The BENLEDI. See Case No. 807.